davit should conform to the rule, and not only state that the claim is justly due, and that there are no offsets against the same to the knowledge of the claimant, but that no payments have been made thereon. Upon the authority of the cases cited, I am constrained to hold that this ground of objection is also well taken, and that, for the reasons stated, the claim must be disallowed.

(4 Misc. Rep. 343.)

## In re SANDERS' ESTATE.

### In re FARRINGTON.

(Surrogate's Court, Herkimer County. May 15, 1893.)

1. PRINCIPAL AND SURETY—EVIDENCE OF RELATION.

A note signed by deceased and P. was made to P.'s aunt, for money to pay off a note to another person, signed by P., on which deceased was surety. The payee knew that P. had the benefit of the money, he having told her that he wished to pay off the previous note. P. personally attended to making payments on the note. All of the indorsements were in his writing, except one by the payee, and all the interest payments were made by P. with his own funds. At one time, deceased asked permission to take his name off the note, which the payee refused, without, however, expressing surprise at the request, and deceased then said that he should see that the note was paid. *Held*, that it was understood that deceased was a surety only.

2. LIMITATIONS—RUNNING OF STATUTE—PART PAYMENT.

On an issue as to whether a delivery of hay to the payee of a note, as a part payment thereon, was by the surety on the note, so as to remove the bar of limitations as against him, the principal maker testified that the hay was his property, and that it came from a farm rented by him from the surety, on which both were living. There was evidence that the payee sent to the farm for a load of hay in P.'s absence, and that the surety said she could have it when P. came home. At a later time the surety asked the payee to show him the note, and, on seeing it, expressed surprise that the delivery of hay did not appear thereon, whereupon the payee said that she and P. usually let their accounts run for some time, and then made one indorsement for the sum total. Several loads of hay were delivered to the payee at different times, and it appeared probable that they were all understood by the surety to be payments by P. on the note. *Held*, that the payment by delivery of hay was not made by the surety.

Claim by Hudson B. Farrington against the estate of Stilman B. Sanders, deceased. Claim rejected.

Upon the return of citations, Hudson B. Farrington appeared, and presented a claim to be proved against the estate, based upon a promissory note assigned to him by the payee, Madeline Harter, which was dated March 8, 1875, for $1,200, executed by Thomas R. Petrie and Stilman B. Sanders, payable one year after date, with interest, and was the joint and several note of the said makers. Sanders died September 18, 1890. Thomas R. Petrie and Marietta S. Gardner were appointed administrators of his estate on October 9, 1890. The administrators interpose the statute of limitations as a defense to the claim against Sanders' estate. On January 1, 1887, Thomas R. Petrie delivered to Madeline Harter, to be applied as a payment on the note, 1,235 pounds of hay, of the value of $8.02; and the claimant asserts that this payment was made by Petrie as the agent of Sanders, by Sanders' direction, and was a payment by Sanders upon the note, and that, by such payment, Sanders renewed his obligation on the note.

J. A. & R. E. Steele, for claimant.
Steele & Prescott, for administrators.

SHELDON, S.   It is well settled that one of the joint and several makers of a promissory note cannot by his own act, in making a payment thereon, postpone or avoid the bar of the statute of limitations as to the other makers; and this is so whether the one making the payment is the principal debtor, and the other makers are sureties, or whether the surety makes the payment. . In any case, a payment, in order to have the effect of a renewal of the obligation, or an extension of the time in which an action may be brought, must be made by the party who is sought to be held, not necessarily in person, but by him or by his agent authorized to do that act for him, so that it is his payment.   Bank v. Ballou, 49 N. Y. 155; Littlefield v. Littlefield, 91 N. Y. 203.   In the case last cited it appeared that the holder of a 'joint and several note, long past due, went to one of the makers, who was a surety for the other maker, and, in substance, asked for payment.   The surety asked the holder to wait until the maker came home, and sent the principal maker a message by the holder, saying, "Tell him, for me, that he must pay the interest, and as much of the principal as he can, and that I say so." ·  The principal maker came home, and the holder delivered the message as directed, and some months afterwards the principal made a payment on the note, and afterwards told the surety of making the payment, and the surety said that it was all right.   It is clear that the effect of the acts of the parties was not otherwise than as though the surety had gone to the principal maker of the note, and said to him:   "You must make a payment on that note. Pay the interest, and as much of the principal as you can."   In pursuance of this direction, the principal maker makes a payment upon the note, and soon after informs the surety of it, and the surety says:   "All right.   That is what I told you to do."   Such a payment is one made with the knowledge and approval of the surety, and in one sense by the direction of the surety, for he instigated the payment.   He set the maker in motion, and directed him to make the payment, and the payment inured to the benefit of both principal and surety, in the reduction of the debt; and, if such payment was the joint act of principal and surety, it would be a payment by the surety, and he could not avail himself of the statute of limitations until six years thereafter.   But such payment cannot be held to be the joint act of principal and surety.   The principal makes the payment out of his funds.   He is only discharging his obligation, both to the holder of the note and to the surety. The surety, in urging the principal to make a payment, was only urging him to do his duty.   It is competent for the surety to direct · the maker to make a payment, as the act and payment of both, although made with the means of the principal, and if so made it will have the same effect as though made personally by the surety. But to establish such a payment the proof must be clear and unequivocal.   In a case where the makers of a joint and several note

were equally liable as between themselves, and one of the makers had, upon the request and direction of the others, made a payment upon the note, or in a case where the surety made a payment upon the request of the principal maker of the obligation, there is ground for contention that such payment is the joint act of the one requesting and the one making the payment, because the principal maker, who requests and induces the surety to make a payment, is thereby discharging his own duty, and contracting a fresh obligation to the surety for the money advanced by the surety to make the payment for the principal.

In the application of these principles to the case in hand, I will first consider in what relation to the other maker of the note was Stilman B. Sanders. It is clearly shown that, at the date of the note, Petrie was the maker, and Sanders one of the indorsers, of a note held by William Reynolds, upon which there was due $1,765, upon which Petrie was the principal debtor, and Sanders was surety, and that the consideration of the note in suit was $1,200 furnished by Madeline Harter, the payee, to pay off the Reynolds note. I think it must be found as a fact that Madeline Harter knew of the fact that Petrie had the benefit of the $1,200, and that, as between themselves, Sanders was only surety for Petrie upon the note. Miss Harter was Petrie's aunt. Petrie testifies that before getting the money he had talked with Miss Harter about it, and told her that he was paying Reynolds a bonus for the use of his money, which he wished to get rid of, and this testimony is not contradicted. Reynolds was paid at Newport, and Miss Harter went to Newport on the day of the payment, with either Sanders or Petrie, to furnish the $1,200. In support of this finding, some weight must be given to the fact that Petrie personally attended to making the payments. None of the indorsements are in Sanders' handwriting, and all, except one made by Miss Harter, are in Petrie's writing. There is no dispute but that nearly all the payments of interest were made by Petrie, with his own funds. The fact, as testified to by Mary A. Farrington, the wife of the claimant, that, in the spring of 1887, Sanders asked Miss Harter to allow him to take his name off the note, and her reply, refusing, but without surprise at such request, and Sanders' remark following, in the same conversation, that he should see that it was paid; that Petrie could have made enough on the place to have paid it long before now, but that she should have her pay; and that he considered that and one other as sacred, and that these were all that he was holden for,—all this indicates a mutual understanding between Miss Harter and Sanders that Sanders was only a surety on the note.

I think it must also be found that the hay delivered to Miss Harter January 1, 1887, to apply on the note, was the property of Petrie, and that Miss Harter so understood it. Petrie testified that about the year 1871 he made an oral agreement with Sanders, whereby he was to give Sanders $100 a year and his support for the use of the farm, and that he occupied the farm under that agree-

ment down to 1890. There was no direct contradiction of Petrie's testimony in this respect, and he testified, also, directly, that all the hay delivered to Miss Harter, as well as the other products of the farm delivered to her, all of which were applied upon the note in question, or upon other notes of Petrie's, held by her, were his property. Now, what is the testimony relied upon to show that Sanders, the surety, made a payment upon the note by Petrie, as his agent, with and by means of the load of hay, which was Petrie's property? Varnum S. Farrington, called as a witness in behalf of the creditor, testified that at the request of Miss Harter he delivered a message from Miss Harter to Sanders, as follows:

"I told Mr. Sanders that Miss Harter (or Lainy) wanted him to send her some hay for her cows, and he said that Petrie was not at home, and, when Petrie came home, that he would send the hay to her."

Mary A. Farrington, the wife of the creditor, was called as a witness in his behalf, and gave testimony concerning a conversation between Sanders and Miss Harter in the spring of 1887, at her house, as follows:

"They talked for some time about church matters. Then he asked if the interest had been paid on the note, and she replied, 'Not all of it.' He then asked if she had any objections to his seeing that note of his and Petrie's. She said, 'No,' and got the note for him to see. He looked at the note, and seemed surprised, and asked if she had not had that hay. He said that he had told Petrie to bring the hay to apply on the note; he told him to do so, and supposed that he had done so. And she replied that he had brought the hay, but that she and Petrie were in the habit of letting their accounts run, and then footing them up, and indorsing them in one indorsement."

In the same conversation, Sanders made the remark "that Petrie could have made enough on the place to have paid it long before now." It is claimed that this conversation referred to the hay delivered to Miss Harter by Petrie January 1, 1887, although it is far from clear that this was so, for by the hay bills it appeared that Petrie had delivered a load of hay to Miss Harter November 24, 1886; another load, January 1, 1887; and another load, February 10, 1887. These several loads of hay were all payments upon the note, and while it is not impossible that one of these loads of hay was sent by Sanders, as a payment by him, the more natural and probable view of the case is that the payments of hay all stood upon the same footing, and that Sanders' view of the transaction, at each time that Petrie took a load of hay to Miss Harter, was that Petrie had done his duty,—had made a payment; and it is not probable that it ever came into his mind that he (Sanders) had made a payment to Miss Harter. Sanders, the surety, could not easily have supposed or intended that when Petrie, the principal debtor, was delivering his own property in payment of his own debt, he (the surety) was making the payment, although, at the request of Miss Harter, he had told Petrie to bring the hay. It is evident that Miss Harter knew of no reason for treating any load of hay delivered about this time as a payment by Sanders, or any differently than any other of Petrie's payments. She supposed the payments to be Petrie's payments, for she told Sanders that Petrie had brought the hay, "but that she and Petrie were

in the habit of letting their accounts run, and then footing them up, and indorsing them in one indorsement." A careful consideration of the circumstances, and the inferences to be drawn from the testimony, does not permit of the conclusion that Petrie was acting as the agent of Sanders when he delivered hay to Miss Harter, about January 1, 1887, to apply as a payment on the note. Mr. Sanders did not make that payment. Therefore, the statute of limitations had barred an action on the note, as against Sanders, prior to his death, and the note and claim cannot be established as a debt to be paid out of Sanders' real estate in this proceeding.